Filed 12/16/13  In re V.N. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re V.N., et al., Persons Coming Under the Juvenile Court Law. | H039608; H039609 (Santa Clara County Super. Ct. Nos. JD21518,  JD21519, JD 21520) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>S.N.,<br><br>        Defendant and Appellant. | |

In February 2013, the juvenile court adjudged father S.N.'s three children (then 12-year-old daughter Vi.N., then 11-year-old son Va.N., and then five-year-old daughter T.N.) dependents of the court and made dispositional orders removing them from father's physical custody.  (Welf. & Inst. Code, §§ 300, subd. (b); 361, subd. (c)(1).)[1]  On appeal, father challenges only the court's dispositional order regarding his son Va.N.  He does not challenge any of the court's jurisdictional orders, nor the removal of his two daughters.  For the reasons stated here, we will affirm the judgments.[2]

---

[1]  All statutory references are to the Welfare and Institutions Code.

[2]  Case No. H039608 is father's appeal of the juvenile court's decisions related to Vi.N. and Va.N., while case No. H039609 is father's appeal of the court's decision as to T.N.  We ordered these cases to be considered together for all purposes.

## I.    JUVENILE COURT PROCEEDINGS

Vi.N. and Va.N. are the children of father and S.T.  T.N. is the daughter of father and W.S.  Because father's appeal challenges only the decision regarding Va.N., our factual and procedural summary is based primarily on the juvenile dependency petition filed on behalf of Va.N. as well as the jurisdictional and dispositional hearing that involved all three children.[3]

On November 5, 2012, a social worker and two San Jose Police Department officers responded to an anonymous tip that two children had been left alone at a house on Munro Avenue in Campbell where father lived with his three children.  One officer interviewed Vi.N. and learned father had left the children alone at the house for at least two days while he played in a poker tournament.  Father is a professional gambler.  Vi.N. informed the officer that her half-sister T.N. also lived with them but that she was with her mother W.S., who was in town from her residence in New Jersey to visit T.N.  Based on father's apparent intention to leave the children unattended for a number of days, as well as the filthy condition of the house (described by responders as "abhorrent" and "consistent with that of a hoarder", the officers placed the children in protective custody.

The Santa Clara County Department of Family and Children's Services (DFCS) filed dependency petitions regarding the minors on November 7, 2012, and an initial detention hearing took place on November 8.  At the conclusion of the hearing, the court placed T.N. with her mother pending resolution of the petitions and placed Vi.N. and Va.N. with a paternal aunt and uncle in San Ramon, California.  Before their placement in protective custody, father had sole physical custody of all three children.

---

[3]  Our review of these appeals was hampered by both parties' failure to cite Clerk's Transcript and Reporter's Transcript volume numbers.  Counsel are reminded that briefs must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."  (Cal. Rules of Court, rule 8.204(a)(1)(C).)

In preparation for the jurisdictional and dispositional hearing, DFCS prepared a report and two addenda. According to the report, S.T., the mother of Vi.N. and Va.N. told the social worker she was presently homeless and unable to take custody of the children given her living situation and lack of relationships with the children. S.T. did, however, express interest in participating in counseling with the children to build a relationship with them.

Regarding the November incident that led to the minors' detention, the jurisdiction and disposition report summarized a conversation father had with a social worker where father claimed he had arranged for T.N.'s mother W.S. to look after the children while he was away. In a separate interview with the social worker, W.S. disagreed with father's story, claiming she told father before he left that she was only able to take care of her daughter while she was in town and that she refused to stay at father's house because of its cluttered condition. W.S. claimed she checked on Vi.N. and Va.N. once during the weekend, took them out for food, and drove them to and from school on Monday, November 5, 2012.

The report identified a number of concerns related to father's parenting. Vi.N. indicated father "always" leaves the children alone when he plays poker, suggesting that the November incident was not uncommon. Additionally, throughout the interview process, father reportedly "minimized his action and responsibility" related to his children's placement into protective custody and denied doing anything wrong. Rather than accept responsibility, father blamed the condition of the home on his family's "hoarder disease" and Vi.N.'s messes. Also concerning to the report's author was father's statement that he told Vi.N. she needed to accept more responsibility for the care of her siblings so that father could focus on playing poker.

Regarding Va.N., the report noted that he has a learning disability affecting his reading and writing abilities, which is being addressed through an Individualized Education Program (IEP). The IEP, which was attached as an exhibit to the report, noted

that father did not respond to phone calls or emails from teachers regarding Va.N.'s progress. The IEP also indicated that Va.N. was tardy 27 times and that "[Va.N.]'s homework is often not done and he ends up doing it at school during recess or lunch." Finally, the jurisdiction and disposition report found it "very concerning" that although Va.N. expressed a strong desire to see his father, "father indicated that he might not be able to call or visit [Va.N.] because he has several scheduled poker tournaments that he needs to focus on."

The two addenda reports filed by DFCS highlighted additional concerns regarding father. The first addendum discussed frustration by the temporary custodians of Vi.N. and Va.N. about father's inconsistent visitation and his failure to provide adequate notice before visits. The custodians also expressed concern that father kept Va.N. out after midnight on one of his visits. On another afternoon visit with Va.N. at the custodians' residence, father reportedly accused his son of cheating at a card game and left without informing the custodians.

In the second addendum, the social worker discussed previously undisclosed allegations of domestic violence perpetrated by father against his children. In the past, when he was upset father reportedly punched Vi.N. and Va.N. on the arms and spanked T.N. on her bottom. It was unclear, however, how recently these incidents occurred. While she was not afraid father would hit her again if she returned to his care, Vi.N. continued to refuse visitation with him, stating that she did not believe he was a good parent.

In February 2013, the juvenile court held a combined jurisdictional and dispositional hearing regarding all three children. Several witnesses testified at the hearing, including father, Vi.N., and multiple social workers. While the testimony was generally consistent with the written reports, certain details merit discussion.

Father admitted he left the children alone for extended periods of time while playing poker "approximately five times" in the past. Father also admitted leaving the

children unattended in a hotel room in Reno, Nevada, for up to six hours while he worked playing poker downstairs. He stated that he now realized he should not have left the children alone. When an attorney for DFCS asked father whether there were any guns in the home, father initially stated that he found a gun owned by his brother while cleaning a room in September 2012 but that he called his brother and told him to pick it up and did not believe there were guns in the house anymore. A few minutes later, however, father stated "I believe there are many guns in the house, but I don't know where they are. They are not my guns." Finally, when asked what issues related to father's parenting DFCS had concerns about, father responded, "I'm not really sure what their ultimate concern is."

The court also heard testimony from Vi.N., who told the court her father was regularly not home during various parts of the day, including when she woke up in the morning, when she arrived home from school, and when she went to bed at night. Vi.N. estimated she cooked dinner for herself and her siblings approximately 70 percent of the time and was often responsible for cooking, cleaning, laundry, and locking up the house. Although father left a phone number where he could be reached, Vi.N. told the court she sometimes had to call him two or three times before he responded.

Va.N. chose not to testify but asked his attorney to express his desire to be returned to his father's custody.

Steve Goeteze, a licensed clinical social worker with Legal Advocates for Children and Youth, testified as an expert in risk assessment. Goeteze explained that leaving pre-teen children alone without adult supervision presents a risk because they are "not equipped to deal with an emergency situation" should one develop. On the subject of the cluttered home, Goeteze stated that the risk associated with the clutter was not alleviated even after father moved to a different residence because "[i]f he does suffer from hoarding or other issues that led to the condition of the home, simply moving out of that environment would not change the intrinsic nature of himself and the situation would

be likely to recur . . . ." Goeteze also discussed specific concerns related to each child. For Va.N., Goeteze noted that he had a "flat affect" during interviews with social workers that made Goeteze worry about Va.N.'s emotional well-being. Additionally, due to the child's "extreme loyalty to his father," Goeteze believed Va.N. was unwilling "to really face what the issues were in the home" without psychological help.

The court found true the allegations of each petition (after conforming them to the evidence adduced at the hearing), admitted the social worker reports as evidence, and determined by a preponderance of the evidence that all three children came within the jurisdiction of the juvenile court pursuant to section 300, subdivision (b). The court also determined that DFCS presented clear and convincing evidence that the welfare of the children required the court to remove them from father's physical custody. Relying on section 361, subdivision (c)(1), the court found "there is or would be substantial danger to their physical health, safety, protection, or physical or emotional well-being . . . if the children were returned home. And there are no reasonable means by which the children's physical health can be protected without removing the children from the parent's physical custody."

The juvenile court then detailed the evidence supporting its jurisdictional and dispositional orders. The court found credible the testimony of the social workers, Vi.N., and W.S. As for father, the court found "overall that much of Father's testimony was not credible." Despite expressing a desire to engage in services when his children were detained in November 2012, the court found father needlessly delayed engaging in services until January 2013. The court also indicated father's answers to questions at the hearing were "frequently evasive" and contradictory.

Of particular concern to the court was father's tendency to blame other people, including his mother and Vi.N., for the "horrific" and "filthy" condition of the home rather than taking responsibility for its condition and understanding that "it was not up to his children to correct those issues." Although the court acknowledged father had moved

prior to the hearing to a different residence deemed adequate by DFCS, the court also found father had not shown a sufficient willingness or ability to keep the new residence clean.

Even setting aside the condition of the home, the court found "the other significant issue of neglect in this case continues to pose a substantial risk of harm to the children." The court noted father himself admitted his practice of leaving the children at home alone at night after they fell asleep to attend card games and also left them alone in hotel rooms while he gambled. Finding not credible father's claim that he left the children home alone only a few times, the court believed Vi.N.'s testimony that father left the children alone for "significantly more time" than father admitted to the court. The court also believed Vi.N.'s testimony that father's absence forced her to provide substantial amounts of care for her siblings before school, after school, and in the evenings. Regarding the November 2012 incident that led to the children's removal, the court found father intended to leave them without adult supervision for up to a week.

Turning to father's ability to provide for his children, the court found that his income was unstable because gambling is "one of the few occupations where earnings are not a certainty and losses are a definite possibility." This instability was substantiated both by father's brother, who told one of the experts about father owing money for gambling losses, and by father himself, who testified to a recent "disastrous setback" related to his gambling. Regarding father's plan of gambling only locally and only during the day while the children were at school, the court found the plan "not credible or even feasible." The court continued that if the children were returned to father's custody immediately, the significant pressure placed on father to support his family would likely compel him to follow his previous pattern of leaving the children unattended, especially at night, while he gambled.

Further future risk to the children came from the domestic violence allegations against father, which the court found true. Based on these previous acts of violence, the

court determined it was likely father might use coercion or threats against the children if they were returned to his care. The court found additional support for its decision in father's willingness to violate court orders, as seen in his decision to take Va.N. for an overnight visit without the approval of the DFCS social worker.

Despite father's acknowledgement at the hearing that his behavior was wrong, the court found he had not shown that his behavior will change. Father did not appear to understand the seriousness of violating court orders. And, perhaps most importantly, the court found father "lacks insight into the extent of the issue and his own ability to correct those issues."

Based on the foregoing evidence and reasoning, the court placed Vi.N. and Va.N. in the custody of their aunt and uncle and ordered family reunification services for the children, father, and S.T. The court awarded sole physical custody of T.N. to W.S. This timely appeal followed.

## II. DISCUSSION

Father challenges the juvenile court's dispositional order only as it relates to his son Va.N. He claims the order was not supported by the requisite clear and convincing evidence of substantial danger to Va.N.'s "physical health, safety, protection, or physical or emotional well-being . . . ." (§ 361, subd. (c)(1).) We review dispositional orders for an abuse of discretion. (*In re Corrine W.* (2009) 45 Cal.4th 522, 532.) When applying this standard, " 'the trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citations.]" (*In re C.B.* (2010) 190 Cal.App.4th 102, 123.) Because father's appeal attacks the juvenile court's findings of fact, we review the entire record to determine whether substantial evidence supported the court's findings. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.) " 'Substantial evidence is evidence that is reasonable, credible, and of solid value.' [Citations.]" (*Ibid.*)

After reviewing the entire record, we conclude that substantial evidence supported the juvenile court's decision to remove Va.N. from father's custody. We therefore find no abuse of discretion. As summarized above, the juvenile court explained its decision to remove custody in detail, relying on the following issues: (1) the condition of the house where the family was living in November 2012 (described by various individuals as "abhorrent," "horrific," and "filthy"); (2) father's failure to show that he addressed the possible underlying mental health issues that led to the condition of the house ; (3) father's neglect in repeatedly leaving his children alone without parental supervision, which occurred more frequently than father admitted; (4) father's delay in engaging in DFCS services; (5) father's unstable income and infeasible future gambling schedule; (6) future risk of domestic violence based on past incidents of violence perpetrated by father against S.T., W.S., and all three children; and (7) father's overall failure to understand or accept responsibility for the issues that led to his children's removal. Each of these findings was supported by substantial evidence before the court, either in reports admitted into evidence or via live testimony at the hearing.

Father claims the juvenile court should have awarded him custody of Va.N. because father admitted his past conduct was wrong and Va.N. expressed a desire to live with father. While true, this evidence does not negate the overwhelming evidence supporting the juvenile court's decision. As for other evidence relied on by father to support his argument, we find that much of it actually provides further support for the dispositional order. For example, father claims he hired tutors to assist with Va.N.'s learning disability and that he participated in his son's IEP. However, the IEP rebuts this assertion of active participation with its statements that father failed to respond to emails or phone calls from Va.N.'s teachers, did not sign paperwork that required a parental signature, allowed Va.N. to be tardy 27 times, and apparently failed to ensure that Va.N. finished his homework. Regarding father's claim that he obtained child care for the children in the form of two babysitters, the social worker who interviewed the potential

caregivers expressed concern about both of them, noting that one initially denied even knowing father.

Because substantial evidence supported the juvenile court's factual findings, we find no abuse of discretion in the dispositional order.

### III.    DISPOSITION

The judgments are affirmed.

_____

Grover, J.

**WE CONCUR:**

_____

Elia, Acting P.J.

_____

Mihara, J.